James Todd and Frank L. Slocum *v.* C. Y. Wheeler and The Sterling Steel Company, Appellants.

*Contract—Construction of contract—Secret process.*

Defendants, manufacturers of steel, desiring to produce a steel suitable for tools, which would be high in carbon and low in chromium, secured the assistance of plaintiffs, and perfected a process by which the desired results were obtained. Subsequently a contract in writing was entered into between defendants as party of the first part, and plaintiffs as parties of the second part, which contained the following recitals: " The said parties of the second part have assisted in the development of, and are informed as to a part of the secret used in the process of manufacturing the steel known and put upon the market as ' Sterling Double Special.' The said parties of the first part wish to protect such part of

said secret, and so protect their manufacture of steel." The plaintiffs were to receive one cent per pound "for every pound of said steel made, sold and collected for, so long as said secret is not discovered and similar steel made and sold on the market by others." The evidence showed that plaintiffs were not the sole inventors or discoverers of the process. Defendants made another steel for the purposes of projectiles which was low in carbon and high in chromium. The process by which the oxide of chromium was reduced was the same as that by which it was reduced in the manufacture of "Double Special." The physical characteristics of the product were wholly dissimilar, the "Double Special" being useless for making projectiles. The "Double Special" was high in carbon and low in chromium and very hard and brittle. The projectile steel was low in carbon and high in chromium, and had great cohesion on impact. *Held,* (1) that the fact that the oxide of chromium was reduced into metallic chromium by the same process in the manufacture of both kinds of steel did not make the two kinds of steel similar steels within the meaning of the contract; (2) that plaintiffs were not entitled to receive one cent per pound for the projectile steel manufactured by defendants.

Argued Nov. 4, 1895. Appeal, No. 221, Oct. T., 1895, by defendants, from decree of C. P. No. 1, Allegheny Co., March T., 1894, No. 901, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for an account.

The facts appear by the opinion of the Supreme Court.

The case was heard by COLLIER, J., on bill, answer and proof, and the following decree was entered:

And now, to wit, July 1, 1895, this cause came on to be heard, and it was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged and decreed as follows:

That the defendants, C. Y. Wheeler and The Sterling Steel Company, account jointly and severally to the plaintiff, James Todd, for the amount or sum of money due him as royalties for all steel made, sold and collected for by them, or either of them, since the month of March, 1890, under the name of "Sterling Double Special Steel," less such sums as have been paid to James Todd as royalties upon "Sterling Double Special Steel;" under the name of "C. Y. Wheeler's Choice;" under the name of "C. Y. W.'s Choice;" under the name of "The Wheeler-

Sterling Armor Piercing Projectiles," and under the name of "Projectiles for cannon;" said royalties to be computed at the price or sum of one cent per pound for each and every pound of steel made, sold and collected for by the defendants, or either of them, or their agents, under said names or either of them.

*Error assigned* was decree as above.

*J. W. Kinnear* and *W. F. McCook*, *P. C. Knox*, *James H. Reed* and *S. W. Cunningham* with them, for appellants.

*Henry C. Todd*, *E. Y. Breck* and *E. B. Vaill* with him, for appellee.

Opinion by Mr. Justice Dean, January 6, 1896:

The defendants were manufacturers of different kinds of steel in Pittsburg and Allegheny county; plaintiffs are chemists and metallurgists. In 1889, plaintiffs undertook to assist in introducing into defendants' factories a process whereby could be turned out a self hardening steel. Mr. Wheeler, president of the Sterling Steel Company, had been a practical steel worker for many years, and had tried to make a high carbon steel containing not less than three per cent of carbon, but had failed in securing the desired results; on making his unsuccessful efforts known to Dr. Slocum, one of plaintiffs, Slocum suggested a method by which the experiments theretofore made by Wheeler, if carried further by chemical combination suggested by him, would result in success, but he declined to give his personal attention to the matter for want of time, and named Mr. Todd as one capable of taking charge of the operation as an assistant. Todd assented, and spent at Mr. Wheeler's works some time in experiments, with a satisfactory result. The manufacture of this quality of steel was then begun by defendants, and was named "Sterling Double Special Steel." In their advertisements and labels, defendants described it by that name. The special quality of the steel made by this process, consisted in the high amount of carbon and low amount of chromium it carried, so that while it could be chilled or hardened at a low red heat, it would withstand in forging, without

injury, a high red heat, and still be very tough in the hardened state. It was especially and to a great extent only valuable as tool steel.

When the steel had proved a success on the market, Todd solicited payment of Wheeler for plaintiff's services. After some negotiations, they entered into a written agreement, of which the following are the material stipulations, the Sterling Steel Company and Wheeler being parties of the first part, and Slocum and Todd parties of the second part:

" The said parties of the second part have assisted in the development of, and are informed as to a part of the secret used in the process of manufacturing the steel known and put upon the market as 'Sterling Double Special.'

" The said parties of the first part wish to protect such part of said secret, and so protect their manufacture of said steel:

" Now therefore, in consideration of the premises . . . . the said parties of the first part hereby agree to pay unto the said James Todd, one of, and agent for, the parties of the second part, the sum of one cent (1c.) per pound for every pound of said steel made, sold and collected for, so long as said secret is not discovered and similar steel made and sold on the market by others ; it being understood and agreed that if such steel is made and sold by any other party or parties, then the said parties of the first part shall cease paying to said parties of the second part the royalty or sum above named, and all contractual relations between the parties hereto arising out of this agreement shall cease.

"It is further understood and agreed that the said parties of the first part shall make a full and complete return of said sales in writing to said Todd at the end of each quarter and pay to him the amount then due.

" It is further understood and agreed that should this steel be made and sold under any other name, or in any other place, by or under authority of the said parties of the first part, that a full and accurate account shall be kept of said sales and a return made to said parties of second part, as provided for above."

There was also appended this additional stipulation signed by Todd and Slocum alone :

" The undersigned parties of the second part, whose signa-

tures are appended to this clause, agree and bind themselves not to impart to anyone whomsoever any part of their knowledge of the secret referred to in this agreement, during the time they receive the royalty herein named, and they further agree to the changing of the word same on the twentieth line of the first page of this agreement to similar."

The same year, in the fall of 1890, Dr. Slocum was permanently employed by defendants as chemist under a special contract, and so continued to be employed, pending this suit; while his name is joined as one of the plaintiffs, he disclaims any right of action. The defendants continued to recognize the contract by payment of royalties to Todd on "Double Special Steel" down to April, 1893, when they stopped payments, and in October of that year served formal notice upon him, denying liability, and an intention to make no further payments.

On February 19, 1894, Todd, joining with him his cocontractor, Slocum, filed this bill, setting out the contract and averring:

1. That plaintiffs continued the use of the process described in the contract; manufacturing by the same process substantially the same kind of steel, but calling it "C. Y. W.'s Choice (C. Y. Wheeler's Choice)" and "Wheeler Sterling Armor Piercing Projectiles."

2. That they had ceased and refused to pay plaintiffs the royalties stipulated.

3. That there was then due and unpaid to plaintiffs for royalties a large sum.

The prayer was for an accounting by defendants, and decree for payment of balance due.

The answer admitted the contract as set out, but averred that it was entered into for the sole purpose of protecting defendants against a disclosure of the secret by plaintiffs to outside parties, and that it therein stipulated if a similar steel was made and sold by other parties, payment of royalties was to cease; that at the date of the notice, similar steel was made and sold by others. That the contract was intended to be terminable by either party at any time; that it ceased to be valuable to defendants, and notice of termination was accordingly given; that up to the date of the notice in October, 1893, there was a balance on "Double Special Steel" of only $47.15 due plaintiffs, which

was by the answer, with interest and costs, tendered them. That plaintiffs' process for manufacture of "Double Special Steel" was used exclusively in the manufacture of tools and had not been used in the manufacture of projectiles for cannon or for other purposes constituting the business of defendants.

The cause was heard before Judge COLLIER under the new rules, sitting in equity. He found as facts:

1. That the secret of the process by which "Double Special Steel" was manufactured had not been discovered, and no similar steel had been made or sold in the market by others.

2. That the defendants had manufactured and sold steel produced by Todd's method of process under the name of "Sterling Double Special Steel," and "C. Y. W.'s Choice" and "C. Y. Wheeler's Choice," and had accounted to and paid to plaintiffs for a part only of the steel so manufactured.

3. That defendants had manufactured by plaintiffs' method "Double Special Steel," and sold it under other names, and have not accounted to plaintiffs nor paid therefor under the contract; and that they had made by the same process substantially, projectiles for cannon and armor piercing projectiles, for which they had not accounted.

From these facts the learned judge, as a conclusion of law, found that defendant should account to plaintiffs for all steel known as "Double Special Steel," made since the month of March, 1890, and should pay the contract royalty for the same; and further, that defendants should account to plaintiffs under the contract for all steel since the same month, named "C. Y. W.'s Choice (C. Y. Wheeler's Choice)," the "Wheeler Sterling Armor Piercing Projectiles," and pay to plaintiffs the contract royalty for the same.

To these findings of fact and legal conclusions, defendants filed exceptions, which after hearing by the court were dismissed, and on July 13, 1895, by final decree, they were ordered to file account within twenty days. From this decree they bring this appeal, assigning eleven errors. The questions raised by them involve principally a construction of the contract, but also in part the determination of a fact.

The plaintiffs rest their case on the contract, and aver they are the inventors of a new method of manufacturing aluminum chromium steel which method they made known to defendants, and is the method referred to in the contract.

What was this method? Mr. Todd, after stating that Mr. Wheeler solicited him to make experiments in the production of a high carbon steel, and for that purpose gave to him entire control of their works, says :—

"I went to the works a number of times over a period of several months—was there a great deal. Shortly after undertaking the experiments,—we had been attempting to reduce the chromium with charcoal, as others had been doing,—I concluded that it would't do ; that the charcoal would leave some of the green oxide there, which was very bad for the steel. I commenced to look around for some better method. I struck upon the method of using aluminum containing a small amount of silicon, and in carrying out the experiments I reduced the metal as far as possible with charcoal in the pot; mixing the green oxide of chromium and the charcoal together and putting the pot into the furnace and exposing it to heat."

Further on in his testimony, he states, the sole object in the "Double Special Steel" process was to get the steel as high in carbon and as low in chromium as possible.

The following are excerpts from Mr. Wheeler's testimony : "I related to Dr. Slocum the line of experiments I had pursued at Hussey, Howe & Company's works when I was manager there, and told him where I had failed, and asked him if he could suggest some way of holding the combined carbon, and he said, yes, that the books showed that a small amount of chromium would allow the combined carbon to remain and still be steel ; that it would show the peculiarity of very hard, close grain, and the susceptibility of being highly heated without apparently destroying the carbon. I asked him then if he would undertake to help me out on that point, and he said that he would. We talked, of course, in long detail, but that was the substance of the talk."

He then narrated his conversation with Dr. Slocum at a subsequent date thus :

"At that time, we concluded that there must be some other way of getting it in better, so we discussed all methods of introducing it, including by aluminum, and it was suggested, I think, by Dr. Slocum, that aluminum, which had greater affinity for free oxygen than any known metal, should be used to reduce not only the chromium to its metallic state, so steel would take

it up, but to eliminate the free oxygen out of the steel, which would again allow us to carry a high carbon. Aluminum was in common use then, and is now, to eliminate the free oxygen."

He further says :—

"I had worked on it for four or five years before that, and simply held it in abeyance for the one point that I wanted. The other points had been taken up and talked over. Dr. Slocum furnished this point just in ordinary conversation, as he would anything of a technical nature that was of interest."

The following is testified to by Dr. Slocum :—

"The process of adding a small amount of chromium to steel was well known as a method of putting in a high per cent of carbon as combined carbon and still remain steel; and the method of getting this chromium by using it from the oxide instead of from the chrome iron stone, which, at that time, nearly all of it was made with. Chromium comes in nature as a chromium iron stone containing iron oxide and chromic oxide, combined together, and these heretofore had been melted in a blast furnace or crucible to produce an alloy of about fifty per cent chromium and fifty per cent iron carbon. This made more or less trouble on account of the high silicon it contains, the silicon being found in the ores, and I suggested to Mr. Wheeler the use of green oxide of chromium; a pure material to start with instead of the raw material as it comes in the market. That was a known fact."

In the light of the testimony of these witnesses, parties to the contract, the preliminary statement in the contract is unmistakable in meaning:—The said parties (Slocum and Todd), have assisted in the development of and are informed as to a part of the secret used in the process of manufacturing the steel known and put upon the market as 'Sterling Double Special.' By the written agreement, neither Todd nor Todd and Slocum together, after the method had proved a success, claimed to be the inventors or discoverers of the process which resulted in the 'Sterling Double Special;' by their own language there is a necessary implication of disclaimer as the sole discoverers of the process. In all this voluminous testimony there is nothing that seriously contradicts Wheeler's statement, and Slocum's testimony is pointedly corroborative. The plaintiffs were not the sole inventors or discoverers of the process

as averred in the bill, but, as stated in the contract, they had assisted in the development of and were informed as to a part of the secret used in the process.

Then comes the second statement of reasons for entering into the contract: The said parties (Wheeler and the Sterling Steel Company) wish to protect such part of said secret (that is, the part known to Slocum and Todd), and so protect their manufacture of said steel; now, in consideration of the premises, Wheeler and the Steel Company agree to pay Slocum and Todd for every pound of steel sold and collected one cent per pound, only, however, "so long as said secret is not discovered, and similar steel made and sold on the market by others." The contract obligation of Wheeler and the Steel Company was, further, that they were to pay the royalty:

If "this steel" should be sold by defendants under other name or at any other place by their authority.

And this obligation to pay was to cease:—

1. If the secret was discovered; then, of course, others would manufacture and put upon the market a steel identical in quality with this one.

2. If a similar steel, one resembling this, should be made and sold upon the market by others; that is, a steel carrying a high carbon and low chromium.

By the contract, the parties had in mind two distinct contingencies, by which their rights and liabilities in the future were to be determined. Their efforts had resulted in the production of the steel "known and put upon the market as Sterling Double Special Steel;" for this, one cent per pound was to be paid; further, the plaintiffs were to be paid, "should this steel be made and sold under any other name." The plaintiffs were not longer to be paid if a similar steel was made and sold on the market by others.

They were to pay for the "Double Special" and for "this steel," alone; that is, a steel of the same nature or character, into the manufacture of which the new process entered; they were to cease paying, if a similar steel, that is, one resembling it in quality, were put upon the market by others, without regard to the process entering into its production.

And that these parties so understood the significance of the two words is shown by their change of the agreement; they had

first used the word "same;" but then, obviously, on reflection concluded it did not express their meaning, so by a written memorandum on the contract they substituted for it the word "similar." As it first stood, according to the language used, the one cent per pound was to be paid as long as identically the same steel was not placed on the market; by the change, defendants were only to pay so long as no other steel resembling the "Double Special" in quality was placed on the market, no matter by what process the other attained its quality.

In other words, the manifest intent of the parties was, that defendants should pay only so long as the monopoly lasted, by reason of the secret process of which Slocum and Todd were in part informed; and it is the plain implication that Slocum and Todd did not longer intend to exact payment. In view of the agreement, it is not material that the reduction of oxide of chromium by the use of aluminum was known by some chemists and metallurgists in Europe before Mr. Todd's experiments; the parties contracted on the assumption the method was not known, or at least not in use in this country; and the introduction of a small amount of silicon into the process seems to have been first suggested by Mr. Todd. But that the larger part of the product of defendants, after May, 1893, so far as the proportions of carbon and chromium were concerned, was entirely different from that of "Sterling Double Special Steel," cannot for a moment be doubted, in view of the evidence.

Mr. Todd testifies, the peculiarity of "Double Special Steel" was "that it would carry a much larger percentage of carbon than ever had been attained, if necessary;" that, according to the comparative tests made by him and Wheeler of Wheeler's best grade of steel and the "Double Special," the latter running very high in carbon, was not as brittle as the Wheeler steel; further that defendants advertised the "Double Special" as containing more carbon than any other steel known or invented. Mr. Wheeler testifies, that the "Double Special" was of three grades, A, B, and C, the first containing $3\frac{1}{4}$ per cent of carbon, the second $2\frac{3}{4}$ and the third 2 per cent; that by the "Double Special" process, he made projectiles from each of these grades, and on a test made by the government every one proved an absolute failure; they possessed no cohesiveness or toughness; they then went on experimenting with projectiles, and finally

were successful by using ten or fifteen times as much chromium as in the "Double Special," and making them low in carbon instead of high. This steel was the complete antagonism of the "Double Special," so far as concerned the proportions of chemical elements contained in it. The oxide of chromium, however, used in its manufacture, was reduced to a metallic state by the use of aluminum and carbon, as in the manufacture of "Double Special." The method, in one particular, of reaching the manufactured product, was more than similar, it was the same, while the physical characteristics of the product were wholly dissimilar; "Double Special" being noted for its brittleness, and therefore was worthless as a projectile. Nor is there any evidence tending to contradict these facts.

We have, then, as tending to show the projectile steel is "Sterling Double Special," the fact that the particular method of reducing the oxide of chromium to a metallic state in the "Double Special," was also used in the manufacture of the projectile; but then, we have on the other side the opposing facts, that, by the use of opposite proportions of carbon and chromium, an exactly opposite quality of steel resulted; the "Double Special" was worthless for projectiles, the projectile steel was worthless for tools. Clearly, this product was not what they meant by "should this steel be made and sold under any other name." It was not the "Double Special" which was advertised to possess the distinctive quality of being high in carbon and low in chromium, for it was low in the first and high in the last. To have sold it as such, after the characteristics of the "Double Special" were established, would have been a fraud upon the public. We are clearly of the opinion that a fair construction of this contract, in view of the undisputed evidence, relieves defendants from any liability to account to plaintiffs for any projectile steel as "Sterling Double Special Steel." This, not because other parties had put upon the market "similar steel," but because projectile steel was not, by the contract, "this steel," that is, "Sterling Double Special." The evidence as to other parties putting on the market similar steel projectiles, is immaterial; the projectiles made by defendants not being the "Sterling Double Special Steel," or "this steel" under another name, as specified in the contract, their non-

liability to pay arises not from a right to cease paying, but because no liability to pay ever commenced.

What we have said is just as applicable to the steel known as "C. Y. W.'s Choice" and "C. Y. Wheeler's Choice." Under the contract and uncontroverted facts, neither brand was "Sterling Double Special Steel." They were wholly different in every essential quality necessary to identification with the "Double Special," and defendants owe no account for them to plaintiffs. Plaintiffs have a right to claim only for the use of and keeping secret the process in making "Sterling Double Special Steel."

The error of the court below is, in holding to one mark alone as sufficient to identity the steel manufactured by defendants as "Double Special Steel" under the contract. As an illustration, take the testimony of Mr. Clapp, a chemist and expert called by plaintiffs; he testified that two steels, possessing by analysis entirely different proportions of chemical elements, one high in carbon and low in chromium, the other high in chromium and low in carbon; one very hard and brittle, the other having great cohesion on impact, yet, if in the manufacture of both, chromium oxide were reduced into metallic chromium, by the same process, the steels would be the same. Although there was much expert testimony contradictory of this view, the court below adopted it as the correct one from which to determine the liability of defendants to account. It may be, among chemists, technically correct to fix the sameness of a manufactured product by a single part of the process entering into its manufacture, without regard to the chemical analysis, its physical characteristics, or its fitness for the purpose intended, but the parties here did not contract on expert opinion of chemists as to what, though widely different, would scientifically be the same. Wheeler had striven for a very hard tool steel; the plaintiffs effectually aided him in producing it; then, it was agreed this production should be put upon the market as "Sterling Double Special Steel," and plaintiffs should be paid one cent per pound, not only for the double special, but for "this steel" under any other name. The "Double Special" was not sold under any other name. The learned judge lost sight of the manifest intention of the parties as evidenced by the undisputed facts and their language in the contract, when he made the issue to turn on a technical definition.

Therefore, the decree which directs defendants to account for projectile steel, " C. Y. W.'s Choice," and " C. Y. Wheeler's Choice," is reversed and set aside. In so far as said decree directs an accounting under the contract for " Sterling Double Special Steel " the decree is affirmed, and an accounting directed under the contract in accordance with our interpretation of it.